**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CATHLEEN A. BELKO, | ) | CASE NO. 1:16-cv-2637 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Social Security*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Cathleen A. Belko (hereinafter "Plaintiff"), challenges the final decision of

Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying her application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under Titles II, XVI, and XVIII of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has jurisdiction pursuant to 42

U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to

an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the

reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

## I.   Procedural History

On February 20, 2014, Plaintiff filed her applications for DIB and SSI, alleging a disability onset date of June 10, 2010. (Transcript ("Tr.") 168-183). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 65-66, 99-100, 129-142). Plaintiff participated in the hearing on October 21, 2015, was represented by counsel, and testified. (Tr. 36- 64). A vocational expert ("VE") also participated and testified. *Id.* On February 2, 2016, the ALJ found Plaintiff not disabled. (Tr. 13-31). On September 16, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-3). On October 28, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 10, 11 & 12).

Plaintiff asserts the following assignments of error: (1) the ALJ erred by failing to designate as a severe impairment obstructive sleep apnea, congestive heart failure, or a cardiac problem; (2) the ALJ failed to give good reasons for rejecting the opinion of her treating physician; and (3) substantial evidence did not support the finding that she was capable of performing her past skilled work. (R. 10).

## II. Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in December of 1963 and was 46-years-old on the alleged disability onset date. (Tr. 13). She had an associate's degree. (Tr. 40-41). She had past relevant work as a collections clerk and a cashier. (Tr. 42-43).

**B. Relevant Medical Evidence**[1]

    **1.   Treatment Records**

On September 27, 2010, Plaintiff complained of left knee pain on and off during the past year, noting a lot of popping and cracking in her knees when walking and occasional swelling. (Tr. 509). She was diagnosed by Michael Jourden, M.D., with benign hypertension, knee joint pain likely related to osteoarthritis, and obesity. (Tr. 509-510). Treatment plan for the left knee pain was continued use of Tylenol Arthritis, weight management, and a reference to physical therapy. (Tr. 510).

On October 27, 2010, Plaintiff complained of bilateral knee pain. (Tr. 505). Megan Brady, M.D., diagnosed Plaintiff as obese (321 lbs.) and a high risk for knee replacement. (Tr. 506). She was instructed to continue using Tylenol PM, and encouraged to lose weight as her weight was a significant contributing factor to her knee pain. (Tr. 506).

On January 20, 2011, Plaintiff reported to a physical therapist that her pain levels were again decreasing and that her pain was down to 3/10 from 5-6/10 at the initial evaluation. (Tr. 497-499). Plaintiff reported that her pain increased when ascending/descending stairs, walking, and standing. (Tr. 498). The physical therapist noted that Plaintiff tolerated the session well, pain levels continued to decrease, and kinesiotaping provided "good relief." (Tr. 499). Plaintiff's long-term goals were to be able to stand for more than 10 minutes and walk more than 5 minutes. *Id*.

On July 27, 2012, Plaintiff went to the Emergency Room (ER) for complaints of fatigue

---

[1]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

and weight loss that she believed was due to her medication. (Tr. 475). She had no edema on examination. *Id*. Julie E. Bruner, M.D., diagnosed atrial fibrillation with rapid ventricular response, dizziness, and benign hypertension. (Tr. 477-478). Use of anticoagulants was noted. (Tr.475).

On July 30, 2012, an echocardiogram interpreted by David Schnell, M.D., revealed left ventricular systolic function was "mildly globally reduced," increased left atrial size, right ventricular function was low normal, a dilated right atrium, a bicuspid aortic valve, fused left and right cusps, mild aortic regurgitation, mild tricuspid regurgitation, a dilated ascending aorta, no evidence of an interatrial shunt, no evidence of a thrombus in the left atrial appendage, and spontaneous echocardiographic contrast was seen in the left atrium, left atrial appendage, and right atrium. (Tr. 527-529).

On April 10, 2013, an x-ray of the left foot interpreted by Thomas Ginley, D.O., revealed no fracture, moderately severe hallux valgus with associated soft tissue bunion and multiple claw toe deformities, and mild to moderately advanced osteoarthritis of the tibiotalar joint. (Tr. 413).

On April 29, 2013, Plaintiff was seen by Cordula Maria Jain, M.D., complaining of headache and dizziness from constant pain in her forehead. (Tr. 401).

On July 25, 2013, Plaintiff's chief complaint was atrial fibrillation, bicuspid aortic valve. (Tr. 383). Dr. Schnell's impression was atrial fibrillation, paroxysmal—present since at least July of 2012, hypertension, obesity, sinusitis, migraines, bicuspid aortic valve with mild AI and mild dilation of ascending aorta, history of deep vein thrombosis, remote stroke, and antiphospholipid syndrome (APLAS). (Tr. 386). Dr. Schnell prescribed an electrocardiogram, an MRI, weight loss (including a referral to weight management consult), and continuing Coumadin. (Tr. 386-387).

On August 8, 2013, an echocardiogram interpreted by Dr. Schnell revealed left ventricular

4

systolic function was "low normal," normal right ventricular size and function, evidence of congenital heart disease consisting of a bicuspid aortic valve, known bicuspid aortic valve—fused right and left cusps, mild aortic regurgitation, no evidence of aortic stenosis, and normal pulmonary artery systolic pressure. (Tr. 524-525).

On September 17, 2013, a physical therapist noted that Plaintiff drives independently. (Tr. 354). At the time of treatment, Plaintiff's pain was rated "0/10 intermittent." *Id*. When experiencing pain, it was characterized as "sharp, aching, shooting, throbbing, tingling/prickling and stabbing" and located in the lower back and buttocks radiating to the right leg. *Id*. Her muscle strength varied from 4/5 to 5/5. *Id*. She had positive tenderness to bilateral lumbar paraspinals on palpation. *Id*. Plaintiff's sit to stand function and bed mobility was "labored, independent," her gait was "antalgic, independent with straight cane and slow," and Plaintiff reported taking the stairs "independently at home but with difficulty and non-reciprocal pattern." (Tr. 355).

On October 10, 2013, a physical therapist noted that Plaintiff's subjective pain was "at present: 2/10 in R side of low back Vs. At Eval: 0/10 intermittent." (Tr. 345). Her functions were unchanged. (Tr. 346). The assessment was mild pain, and Plaintiff was noted to be "doing well." (Tr. 346). On the same day, she was noted to have continued pain in her left foot and was wearing a brace. (Tr. 340).

On January 18, 2014, a physical therapist noted that Plaintiff's "[p]ain scale at present: R 9/10; L 8/10 Vs. At Eval: 8/10 constant with weight bearing, with ambulation and with non weight bearing." (Tr. 301). Plaintiff's gait had a "[w]ide base of support Bilateral and Increased hip external rotation Bilateral." (Tr. 302). The assessment was "Pt continues to be very painful and have ROM restrictions. Strength improved, but pt still has poor balance/proprioception,

standing and walking tolerance. Still having difficulty with most functional activities." (Tr. 302).

On January 31, 2014, Plaintiff was admitted to the hospital due principally to hypoxia and secondarily for essential hypertension benign, obesity, atrial fibrillation, paroxysmal atrial fibrillation, reactive airway disease, and viral URI. (Tr. 291-292). She was treated by Sandra M. Glagola, D.O., and discharged on February 2, 2014. (Tr. 292-294).

On March 31, 2014, Plaintiff was seen by Angela Douglas, a certified nurse practitioner (CNP) for evaluation of the L-spine. (Tr. 1183-87). On examination, Plaintiff's spine was symmetric without scoliosis, and no ecchymoses or erythema. (Tr. 1186). There was positive tenderness to palpation over L-spine midline, and bilateral paraspinals. *Id*. Plaintiff's trunk range of motion (ROM) was normal but painful, and hip ROM was limited due to pain. *Id*. Fabere's test and facet load tests were positive. *Id*. Ms. Douglas completed a disability document on April 10, 2014, which is referenced below.

On the same date, an x-ray revealed, lumbar levoscoliosis with a rotatory component and degenerative changes of the lumbar spine. (Tr. 1189-1190). Disc space narrowing was present at L2-L3 and was most pronounced at LS-Sl. *Id*. There was also "slight loss of height along the superior endplate of L3 of indeterminate age," as well as "[a]nterolisthesis of LS with respect to Sl and retrolisthesis of L2 with respect to L3 and L3 with respect to L4." *Id*.

On April 1, 2014, a pulmonary function test revealed "[m]ild obstructive lung defect with no response to bronchodilators, if there is a clinical suspicion for asthma consider methacholine challenge test." (Tr. 1191).

On April 2, 2014, Plaintiff was seen by Dr. Schnell with a chief complaint of atrial fibrillation, bicuspid aortic valve. (Tr. 1121). She had normal extremities, no deformities, mild right lower extremity edema, and discoloration of the right calf and thigh reportedly stemming

from a recent fall. (Tr. 1124). Dr. Schnell's impression was atrial fibrillation, paroxysmal—

present since at least July of 2012, hypertension, obesity, sinusitis, migraines, bicuspid aortic

valve with mild AI and mild dilation of ascending aorta, history of deep vein thrombosis, remote

stroke, and APLAS. (Tr. 1125). Dr. Schnell prescribed an electrocardiogram, weight loss

(including a referral to weight management consult), and continuing Coumadin. (Tr. 1125-26).

She requested that he complete a disability form. (Tr. 1126).

On April 21, 2014, a physical therapist noted that Plaintiff's pain was 6-7/10 subjectively

versus 7/10 constant on evaluation. (Tr. 1153). Plaintiff's gait was "[w]ide base of support

Bilateral and Increased hip external rotation Bilateral." (Tr. 1154). The assessment noted that

Plaintiff "[d]id not progress." (Tr. 1155).

On April 24, 2014, Plaintiff was seen for the first time by Jeffrey J. Alexander, M.D. (Tr.

1148-1152). Dr. Alexander noted Plaintiff's "history of morbid obesity, hypertension, atrial

fibrillation antiphospholipid antibody syndrome and DSD," and that she was referred for the

evaluation of venous insufficiency. (Tr. 1148). He noted Plaintiff's previous treatment in 2009

for severe venous insufficiency with stasis ulceration, indicating "[s]he eventually healed her

ulcers, but now develops recurrence on a fairly regular basis." *Id*. Based on Plaintiff's self-

reporting, she applied zinc oxide when she develops new ulcers and "has done relatively well."

*Id*. Plaintiff did, however, tell Dr. Alexander that she had been unable to work due to pain and

swelling associated with both sitting and standing. *Id*. Aside from Plaintiff's subjective reporting,

Dr. Alexander found as follows:

> On examination, this is in [sic] a morbidly obese woman in no acute distress.
> Lungs clear to auscultation. Heart regular in rate and rhythm without murmur.
> Abdomen obese soft and nontender. The legs are large. The patient is wearing
> surgical support stockings. She has chronic venous stasis changes of both lower
> extremities with stasis discoloration and scarring from previous ulcers. No active

7

> ulceration is present. Pedal pulses palpable.
>
> The patient currently is stable but with severe chronic venous insufficiency. She is currently applying for disability. Appropriate paperwork will be completed for her.

(Tr. 1149).

On July 26, 2014, Plaintiff was seen by Michael Steinmetz, M.D., who found she had 5/5 strength in her upper and lower extremities, was morbidly obese, and in no acute distress. (Tr. 1332-35). Plaintiff had "[d]ifficulty walking related to obesity and tendonitis according to patient." (Tr. 1335). It was noted surgery may be an option, but that she will undergo injections in the interim. *Id*.

On August 18, 2014, a leg x-ray revealed "[n]o acute findings. Moderate degenerative joint disease at the knee." (Tr. 1241).

On August 20, 2014, Plaintiff reported to the ER complaining of five days of pain in her knee resulting in difficulty walking. (Tr. 1236). She was diagnosed with a knee sprain by David A. Levine, M.D. (Tr. 1238). On the same date, she was seen by Joseph M. Lowry, D.O., who diagnosed exacerbation osteoarthritis, and recommended a cortosteroid injection, which was administered without complication. (Tr. 1249-1250). She was noted to be morbidly obese with a BMI of 49. (Tr. 1249). He opined that Plaintiff would likely require a knee replacement at some point given her relatively young age. (Tr. 1250).

On August 23, 2014, Plaintiff was seen by a podiatrist, Jerome Lamendola, DPM. (Tr. 1253). He noted that "the x-rays show the mid foot and ankles are rotated internally. the pt center of gravity is off center and puts pressure on the ankle laterally." *Id*. He diagnosed "severe taliopes valgus bilaterally and have deformity bilaterally," resulting in bilateral knee pain. *Id*.

On December 11, 2014, Plaintiff was seen by Manuel A. Martinez, M.D., who diagnosed

right hamstring strain and morbid obesity. (Tr. 1441-42).

On January 16, 2015, a CT scan of the chest revealed an enlarged heart and "reflux of contrast into the inferior vena cava suggestive of right-sided heart failure." (Tr. 1656).

On February 6, 2015, a nurse practitioner noted Plaintiff had a "wound to the left leg, with foot and ankle wounds that have closed." (Tr. 1546-47).

On February 20, 2015, a nurse practitioner noted Plaintiff had "wounds to left leg and cellulitis to left foot and toes." (Tr. 1585).

On April 7, 2015, podiatrist Lamendola noted Plaintiff had an ulceration on her second toe. (Tr. 1444).

On May 19, 2015, a pulmonary function test revealed a "mild restrictive ventilatory defect but obstruction cannot be excluded without lung volumes. Obesity may be the cause." (Tr. 1468).

One June 11, 2015, Plaintiff was seen by Mark Dunlap, M.D., whose impression was heart failure with preserved left ventricular systolic function and sever obstructive sleep apnea. (Tr. 1455-56).

On September 2, 2015, a physical therapist assessed "[d]ecreased knee and ankle stability," noting Plaintiff "ambulates slowly with cane, fearful of falling." (Tr. 1850).

## 2.   Medical and Non-Medical Opinions Concerning Plaintiff's Functional Limitations

### a. Opinions Concerning Mental Impairments

On March 26, 2014, Haley A. O'Connell, Psy.D., performed a psychological consultative examination for purposes of her disability claim. (Tr.1135-40). On mental status examination, Plaintiff's appearance was clean and neat and her behavior was cooperative; she did not appear to exaggerate or minimize her symptoms. (Tr. 1137-1138). Her thought processes were clear and logical, her speech was neither pressured nor slowed, and she displayed no loose associations or

flight of ideas. (Tr. 1138). She displayed no autonomic or motoric indications of anxiety, she was in good spirits, and displayed appropriate affect. *Id*. She was alert, responsive and oriented x 4. *Id*. Her general intelligence appeared to fall within the average to bright-average range. *Id*. She had sufficient judgment and adequate insight. (Tr. 1138-39). The psychologist concluded that "there is insufficient evidence to substantiate a diagnosis such as a Depressive Disorder or Adjustment Disorder. Therefore, no DSM-V diagnoses are provided and functional assessments are also not provided." (Tr. 1139).

### b. Opinions Concerning Physical Impairments

On April 10, 2014, nurse practitioner Douglas opined that Plaintiff could lift no more than 16 pounds, and lift less than 15 pounds occasionally and less than 10 pounds frequently. (Tr. 1143-44). She stated that Plaintiff could stand a total of 2 hours in an 8-hour workday in 10 minute increments. (Tr. 1143). She opined Plaintiff could sit for a total of 4 hours in one-hour increments. *Id*. She stated that a "[p]atient interview" and her "medical history" supported her assessed findings. (Tr. 1143). With respect to postural activities, she opined Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl. *Id*. With respect to environmental restrictions, Ms. Douglas found Plaintiff's ability to be around heights, moving machinery, and vibration was affected. *Id*. She estimated Plaintiff would be absent about three days per month and be off-task over 20 percent of the time due to pain or fatigue. (Tr. 1144). She stated that Plaintiff would need to lie down every 10 minutes, and needed about four unscheduled breaks per day. (Tr. 1144).

On April 26, 2014, Dr. Alexander, two days after Plaintiff's first and apparently only visit, completed a disability form indicating that Plaintiff could lift less than 10 pounds occasionally, less than 5 pounds frequently due to serious venous insufficiency. (Tr. 1232). He opined Plaintiff could stand/walk approximately one hour in an 8-hour workday for 30 minutes without

interruption. *Id*. He further opined that she could sit for 1 to 2 hours in less than 30 minute increments due to the need to elevate her legs. *Id*. Despite the above, Dr. Alexander opined Plaintiff could balance, stoop, crouch, crawl, and kneel occasionally (very little up to 2 hours a workday). *Id*. Plaintiff's impairments affected her ability to be exposed to heights, moving machinery, temperature extremes, chemicals, dust, fumes, and humidity. *Id*. He estimated she would be absent more than four days per month and be off-task over 20 percent of the time due to pain or fatigue. (Tr. 1233). He stated that Plaintiff would need to lie down every two hours, and needed about four unscheduled breaks per day. *Id*.

On May 3, 2014, State Agency physician Gary Hinzman, M.D., reviewed the evidence of record, and opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand/walk 4 hours and sit for 6 hours in an 8-hour workday. (Tr. 78-80). In addition, he found that she could occasionally climb ramps/stairs, stoop, and balance, but could never kneel, crawl, crouch, or climb ladders/ropes/scaffolds. (Tr. 78). She had no manipulative, visual, or communicative limitations, but needed to avoid all exposure to hazards. (Tr. 79).

On June 17, 2014, State Agency physician Bradley J. Lewis, M.D., reviewed the evidence of record, and offered an opinion nearly identical to Dr. Hinzman save for some discrepancies regarding postural activities. (Tr. 108-110).

### C. Relevant Hearing Testimony[2]

At the October 21, 2015 hearing, the VE classified Plaintiff's past relevant work as those of a *collections clerk*, Dictionary of Occupational Titles ("DOT") 241.357-010, sedentary work,

---

[2] Because Plaintiff has not argued any error with respect to the ALJ's credibility analysis, the recitation of the hearing testimony is confined to the testimony of the vocational expert (VE), as Plaintiff has alleged that she was unable to perform her past relevant work. (R. 10, PageID# 22-24).

level 5, and, *cashier*, DOT 211.462-010, light, unskilled, with an SVP of 2. (Tr. 58).

The ALJ posed the following hypothetical question to the VE:

> Then, if you would consider first a person of the claimant's age, education and past relevant work experience with the Residual Functional Capacity for light work, but with standing and walking limited to four hours of eight, sitting six hours of eight, with the ability to use bilateral lower extremities frequently to operate foot controls. Who could occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds. Occasionally balance, frequently stoop. Never crouch, frequently crawl, but who would have to avoid all exposure to hazards defined as industrial machinery, unprotected heights and similar things.

(Tr. 58-59).

The VE testified that such an individual could perform the jobs of a collections clerk, both as performed by Plaintiff and as it is actually performed. (Tr. 59). The VE testified the cashier job would be precluded because the hypothetical was more akin to sedentary work. *Id.*

The ALJ posed a second hypothetical that incorporated the same limitations as the first, with the added requirement that the individual needed a cane for ambulation. (Tr. 59). The VE testified such an individual could still perform the collections clerk job. (Tr. 59-60).

A third hypothetical incorporated the earlier limitations with the addition that the individual could only have superficial contact with the general public. (Tr. 60). The VE testified that such a limitations would preclude the performance of Plaintiff's past relevant work. *Id.* Nevertheless, such an individual could perform the following jobs: polisher, DOT 713.687-034; document preparer, DOT 249.587-018, and, mailing house worker, DOT 209.587-010. (Tr. 61).

Based on questioning by Plaintiff's counsel, the VE testified that an individual limited to semi-skilled work would be unable to perform the collections clerk position. (Tr. 61-62).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes

disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6ᵗʰ Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6ᵗʰ Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act for Medicare insurance coverage through December 31, 2015.

2.  The claimant has not engaged in substantial gainful activity since December 1, 2013, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: recurrent arrhythmias, osteoarthritis, degenerative disc disease of the lumbar spine, chronic venous insufficiency, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except the claimant can stand and/or walk for 4 hours in an 8-hour day and needs to use a cane for ambulation; sit for 6 hours in an 8-hour workday; frequently use the bilateral lower extremities to operate foot controls, stoop, and crawl; occasionally climb ramps and stairs; occasionally balance; never climb ladders, ropes, or scaffolds; never crouch; and should avoid all exposure to hazards defined as industrial machinery, unprotected heights, and similar things.

6.  The claimant is capable of performing past relevant work as a Collection Clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2013, through the date of this decision (20 CFR 404.1520(1) and 416.920(1)).

8.  In addition, based on the application for a period of Medicare Qualified Government Earnings benefits filed on February 20, 2014, the claimant is not entitled to benefits under part A of title XVIII of the Social Security Act - Hospital Insurance.

(Tr. 15-30).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.   Plaintiff's Assignments of Error

#### 1. Severe Impairments

As defined by Social Security regulations, a "severe" impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). "At step two 'significant' is liberally construed

in favor of the claimant[, but] [t]he regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 428 (6th Cir. 2007); *see also* 20 C.F.R. § 416.920a(d)(1) ("If [the Commissioner] rate[s] the degree of limitation as 'none' or 'mild', [the Commissioner] will generally conclude that [the] impairment is not severe…") The Sixth Circuit Court of Appeals has construed Step Two's severity requirement as a "de minimus hurdle." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007).

In the first assignment of error, Plaintiff contends the ALJ erred by failing to designate obstructive sleep apnea, congestive heart failure, a pulmonary problem, or a cardiac impairment among her "severe" impairments. (R, 10, PageID# 1935-1937). Here, the ALJ designated several impairments as severe, including the following: recurrent arrhythmias, osteoarthritis, degenerative disc disease of the lumbar spine, chronic venous insufficiency, and obesity. (Tr. 16). Notably, arrhythmia is a cardiac impairment defined as an "abnormality of either the rate, regularity, or site of impulse origin or the sequence of activation" of a heartbeat. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 30th ed. 2003. While the ALJ did not designate the other alleged impairments as "severe," failure to do so lacks significance, as explained below. Because an ALJ must move on to the subsequent steps in the sequential evaluation if only one impairment is found to be "severe," an ALJ is not required to analyze the remainder of a claimant's impairments to determine whether they too are severe. *See, e.g., Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008) ("The fact that some of [claimant's] impairments were not deemed to be severe at step two is … legally irrelevant") (*citing Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987) (same) holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe); *Nejat*

*v. Comm'r of Soc. Sec.*, 359 Fed. App'x. 574, 577 (6th Cir.2009) (same); *McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. App'x. 516, 522 (6th Cir. 2008)). After the ALJ makes a finding of severity as to even one impairment, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184 at *5 (Jul. 2, 1996).

When the ALJ considers all of a claimant's limitations caused by both severe and non-severe impairments at the remaining steps of the sequential evaluation, the ALJ's failure to designate an impairment as "severe" at step two does "not constitute reversible error." *Maziarz*, 837 F.2d at 244; *see also Nejat*, 359 Fed. App'x at 576-577. Here, the ALJ expressly noted that she was considering "both the severe and non-severe impairments" when arriving at the RFC determination. (Tr. 29). Thus, while Plaintiff is correct that the ALJ did not designate the above enumerated impairments as "severe" impairments, the ALJ found multiple severe impairments, continued with the sequential evaluation, and considered the impact of non-severe impairments as well to determine the RFC. Although Plaintiff asserts that the omitted impairments could cause shortness of breath, fatigue, and mental limitations,[3] she does not specifically address how the RFC was inadequate, and does not point to any particular work related limitations that should have been included. Moreover, Plaintiff has not pointed to any opinions from medical sources suggesting that these impairments would result in limitations inconsistent with the demands of the RFC. As such, she has not established that failure to include the aforementioned impairments in the category of severe impairments resulted in reversible error. *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360 at *2 (N.D. Ohio June 18, 2015) ("any failure on the part of the ALJ at

---

[3] The ALJ's decision to forego any mental limitations is discussed in the context of the third assignment of error, *infra*.

step two to consider plaintiff's migraine headaches to be a severe impairment is 'legally

irrelevant' because the ALJ found that plaintiff suffers from other severe impairments")

(Gaughan, J.).

For the foregoing reasons, the first assignment of error is without merit.

**2. The Weight Ascribed to the Opinion of Dr. Alexander**

In the second assignment of error, Plaintiff asserts that the ALJ erred by failing to set forth

good reasons for not crediting a number of restrictions set forth in an April 25, 2014 opinion

authored by Dr. Alexander, whom she characterizes as a treating physician. (R. 10, PageID#

1938-1944). Conversely, the Commissioner, while neither explicitly conceding nor challenging

whether Dr. Alexander constitutes a treating source under the regulations, avers that the ALJ

gave "good reasons" for the weight ascribed to the opinion evidence from Dr. Alexander. (R. 11,

PageID# 1961-1965).

"Provided that they are based on sufficient medical data, 'the medical opinions and

diagnoses of treating physicians are generally accorded substantial deference, and if the opinions

are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240

(6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words,

"[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion

'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not

inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc.

Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ does not give a treating source's opinion

controlling weight, then the ALJ must give "good reasons" for doing so that are "sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

18

source's medical opinion and the reasons for that weight."[4] *See Wilson*, 378 F.3d at 544 (*quoting*

Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5). The "clear elaboration

requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d

395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of

their cases, particularly in situations where a claimant knows that [her] physician has deemed

[her] disabled and therefore might be especially bewildered when told by an administrative

bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*,

378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)); *see also Johnson v.*

*Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 846 (N.D. Ohio 2016) ("The requirement also ensures

that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's

application of the rule.") (Polster, J.)

---

[4] New regulations effective March 27, 2017, 20 C.F.R. §§ 404.1527 & 416.927, set forth the rules for evaluating opinion evidence, both medical and nonmedical, for claims filed *before* that date.   Conversely, 20 C.F.R. §§ 404.1520c & 416.920c set forth the rules for evaluating such evidence for claims filed *on or after* March 27, 2017. The latter regulations, not applicable to the present case, eliminate the term "treating source," as well as what is customarily known as the "treating source rule." *See also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 81 FR 62560 at 62573-62574 (Sept. 9, 2016) ("we would no longer give a specific weight to medical opinions … this includes giving controlling weight to medical opinions from treating sources … [and] [w]e would not defer or give any specific evidentiary weight, including controlling weight, to any … medical opinion, including from an individual's own healthcare providers.") It bears noting that the current iterations of §§ 404.1527 & 416.927, while purporting to apply to claims filed *before* March 27, 2017, are not identical in language to the version in effect at the time of the ALJ's decision. For the sake of consistency, the court continues to cite the language from the former regulation sections that were in effect at the time of the ALJ's decision.   Furthermore, while the current language of the regulations has been modified and renumbered, the changes, on their face, do not appear to be substantive and would not alter this court's recommendation. As noted by the Social Security Administration (SSA), for cases filed before March 27, 2017, it "will continue to apply [its] current rules for evaluating evidence from a treating source …." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844 at 5861 (Jan. 18, 2017). Thus, the SSA also does not perceive its changes to be substantive.

It is well-established that administrative law judges may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). If fully explained with appropriate citations to the record, a good reason for discounting a treating physician's opinion is a finding that it is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

First, the court does not agree that Dr. Alexander qualified as a treating source at the time he rendered the opinion dated April 26, 2014. Plaintiff's brief does not identify any treatment notes of record by Dr. Alexander that predate the opinion, save for only the single examination that occurred one day earlier. Further, the treatment notes themselves indicate that the reason for Plaintiff's visit was: "New patient, to establish relationship." (Tr. 1148). In addition, this court's own review has not uncovered any prior treatment in the record by Dr. Alexander. Significantly, the ALJ did not specify that she considered Dr. Alexander a treating source at the time the opinion was rendered. (Tr. 24-25). While it is Plaintiff's burden to establish that a treating

relationship existed, this court has not uncovered any subsequent treatment in the record by Dr. Alexander, who appears to have seen Plaintiff only once. In addition, it would be of no consequence if this doctor rendered treatment *after* the opinion in question was authored, because "subsequent visits to [a physician] are irrelevant in determining whether the opinion was that of a treating physician *when it was completed*." *Witnik v. Colvin*, No. 14cv-257, 2015 WL 691329 at *5 (N.D. Ohio Feb. 18, 2015) (White, M.J.) (emphasis added). "The question is whether [the claimant] had the ongoing relationship with [the physician] to qualify as a treating physician *at the time he rendered his opinion*." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 506 (6th Cir. 2006) (emphasis added). In *Kornecky*, the Sixth Circuit declined to find a treating physician relationship, noting that visits to a physician *after* an assessment had been made "could not retroactively render [the doctor] a treating physician at the time of the assessment." 167 Fed. App'x at 506 n.10; *cf. Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485 (6th Cir. 2005) (finding that a physician who only saw the claimant twice was not a treating physician despite the ALJ referring to the physician as such).

Because Dr. Alexander was not a treating physician at the time the opinion was rendered but rather merely an examining source, his opinion is not subject to the rigors of the treating physician rule. Other courts have determined that "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." *Williams v. Colvin*, 2015 WL 5165458 at *5 (N.D. Ohio, Sept. 2, 2015) (*citing Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496 (6th Cir. 2006); *accord Chandler v. Comm'r of Soc. Sec.*, 2014 WL 2988433 at *8 (S.D. Ohio, July 1, 2014) ("the ALJ is not required to give 'good reasons' for rejecting a nontreating source's opinions in the same way as must be done for a treating source").

While a claimant may disagree with the ALJ's explanation as to why little weight was assigned to a non-treating medical source, such a disagreement with the ALJ's rationale does not provide a basis for remand. *See, e.g.*, *Steed v. Colvin*, 2016 WL 4479485 (N.D. Ohio Aug. 25, 2016) (McHargh, M.J.).

Instead, an ALJ, when arriving at the RFC assessment, "must always consider and address medical source opinions [and] [i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996); *see also Puckett v. Colvin*, 2014 WL 1584166 at *9 (N.D. Ohio April 21, 2014) (Vecchiarelli, M.J.) (explaining that, although the ALJ was *not* required to evaluate opinions of consultative examiners with the same standard of deference as would apply to an opinion of a treating source, he was required to "acknowledge that [the examiners'] opinions contradicted his RFC finding and *explain* why he did not include their limitations in his determination of Plaintiff's RFC") (emphasis added).

The ALJ addressed Dr. Alexander's opinion from April 26, 2014, as follows:

> On April 25, 2014, the claimant was evaluated for venous insufficiency by Dr. Jeffrey Alexander, who noted the claimant was complaining of a recurrence of ulcers, with pain and swelling, though she has done relatively well with an application of zinc oxide and noted she wears surgical support stockings on a daily basis and elevates her legs (Exhibit 6F, 4 ). On examination, she was noted to have large legs though was morbidly obese and in no acute distress. Her lungs were clear to auscultation, and her heart was regular in rate and rhythm without murmur. She had chronic venous stasis changes of both lower extremities with stasis discoloration and scarring from previous ulcers, however Dr. Alexander found no active ulceration was present and pedal pulses were palpable (Exhibit 6F, 5). Dr. Alexander found severe chronic venous insufficiency though also noted she was currently stable, yet she was requesting disability paperwork (Id.). Dr. Alexander completed the disability paperwork on April 26, 2014 opining as to an ability to lift less than 10 lbs. occasionally, less than 5 lbs. frequently, stand and/or walk for less than I hour in an 8 hour workday for less than 30 minutes at a time, sit for 1-2 hours total and keep her legs elevated for less than 30 minutes at a time, never climb, would have numerous environmental restrictions including

with chemicals, fumes, humidity, temperature, dust, heights, and machinery, would miss work more than four days per month, be off task over 20% of the time, would need to lie down for 2 hours or more during the day, would be limited to the use of her hands, and would need unscheduled breaks about four times per day (Exhibit 5F). However, these extreme findings are unsupported by the doctor's examination findings of no active ulcerations, that she was in stable condition, and doing well with applications of zinc oxide as noted above and as such his opinions are given little weight.

The possibility always exists that a medical provider may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from medical personnel, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Tr. 24-25).

The decision adequately *explains* why the limitations assessed by Dr. Alexander were not adopted and incorporated into the RFC. The explanation requirement applicable to examining, but non-treating sources is not as rigorous as the good reasons requirement of the treating physician rule. *See, e.g., Moscorelli v. Colvin*, No. 1:15cv1509, 2016 WL 4486851 at **3-4 (N.D. Ohio Aug. 26, 2016) (Lioi, J.) (observing that a thin explanation that would not constitute a good reason for discounting a treating source's opinion may, nevertheless, satisfy the explanation requirement for a non-treating source). First, the ALJ explained that the alleged limitations were inconsistent with the lack of active ulcerations of the leg, the physician's notation that zinc oxide treatment was working, and his description of the patient as stable. (Tr. 24). Second, the ALJ expressly ascribed "great weight" to the opinion of State Agency medical consultants Drs. Hinzman and Lewis. (Tr. 29). While it is generally true that more weight is typically afforded to examining sources, such as Dr. Alexander than the opinion of non-

23

examining sources such as the State Agency consultants, *see* 20 C.F.R. § 416.927(c)(1), nevertheless, "it is not a *per se* error of law, as [claimant] suggests, for the ALJ to credit a nonexamining source over a nontreating source." *Norris v. Comm'r of Soc. Sec.*, 461 Fed. App'x 433, 439 (6th Cir. 2012); *accord Moscorelli*, 2016 WL 4486851 at *3.

In a recent decision from the Southern District of Ohio, *Lowther v. Comm'r of Soc. Sec.*, No. 2:15-cv-3010, 2016 WL 7111604 at *7 (S.D. Ohio, Dec. 7, 2016), *adopted by 2017 WL 25551 (Jan. 2, 2017)*, the court reasoned that where there was no opinion from a treating source with a longitudinal picture of a claimant's health, each medical source opinion was based on a limited amount of evidence. *Lowther*, 2016 WL 7111604 at *7. The *Lowther* court reasoned that the ALJ's decision to place more weight on the conclusions of a non-examining State Agency consultant, who reviewed the record, than those of two consultative examining psychologists "was within the permissible 'zone of choice' afforded to an ALJ." *Id.* (citations omitted). This court agrees with the sound reasoning of the *Lowther* decision, and finds that the ALJ did not err by assigning greater weight to the non-examining opinions of Drs. Hinzman and Lewis, which were offered more recently than Dr. Alexander's opinion and who had the benefit of access to Plaintiff's other medical records—including Dr. Alexander's April 2014 treatment record. (Tr. 73-76, 91).

Thus, the ALJ adequately explained why Dr. Alexander's opinion was assigned little weight. As such, the second assignment of error is without merit.

### 3. Ability to Perform Past Relevant Work

In her third and final assignment of error, Plaintiff claims she had issues with memory, focus, and concentration, which render her unable to perform her past relevant work. (R. 10, PageID# 1944-1946). Because the hypothetical did not account for these alleged limitations,

Plaintiff argues, the finding that she could perform her past relevant work was erroneous. *Id.*

A hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by the evidence in the record, it need not reflect unsubstantiated allegations by claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

Plaintiff cites no medical source opinions suggesting that she required limitations stemming from her mental impairments, save for the aforementioned rejected opinion of Dr. Alexander and the opinion a nurse practitioner, which the ALJ also expressly rejected.[5] (Tr. 24). The ALJ expressly assigned great weight to the opinions and conclusions of the psychological consultative

---

[5] Under the rules in effect at the time of the decision, nurse practitioners are not considered acceptable medical sources, as they are not listed as one of the five types of "acceptable medical sources," but rather are designated as "other sources." *Compare* 20 C.F.R. § 404.1513(a) with 20 C.F.R. § 404.1513(d); *see also Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (finding the ALJ has the discretion to determine the appropriate weight to accord the opinion a non-medical "other source"). Nevertheless, while nurses are not "acceptable medical sources" under the regulations, Social Security Ruling 06–03p, 2006 WL 2329939 (Aug. 9, 2006)  notes that information from "other sources" such as nurse practitioners "are important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* The Sixth Circuit has found that opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06–03P … the ALJ should have discussed the factors relating to his treatment of [nurse practitioner] Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). Plaintiff, however, has not argued that the ALJ failed to adequately explain her reasons for rejecting the nurse practitioner's opinion.

examiner, Dr. Connell. (Tr. 18). Dr. Connell declined to ascribe any mental limitations to Plaintiff given the paucity of any evidence of record. (Tr. 1139). As such, Dr. Connell's opinion constitutes substantial evidence upon which the ALJ reasonably relied to omit any mental or cognitive based functional limitations.

Finally, Plaintiff's brief relies on her own testimony to suggest that greater limitations were warranted. The ALJ, however, expressly found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 21). As stated above, the hypothetical posed to the VE need only incorporate limitations the ALJ accepted as credible and not the unsubstantiated allegations by claimant. To the extent Plaintiff would take issue with the ALJ's decision to deem her testimony not fully credible, she has not presented the court with a legal argument challenging the ALJ's credibility determination, and, therefore, has waived such argument. *See, e.g., Siple-Niehaus v. Comm'r of Soc. Sec.*, No. 5:15cv01167, 2016 WL 2868735 at n. 12 (N.D. Ohio, May 17, 2016) (finding that plaintiff "has not challenged the ALJ's credibility determination" and, therefore, "arguments pertaining to the ALJ's assessment of her credibility have been waived.") (Burke, M.J.); *cf. Williams v. Comm'r of Soc. Sec.*, No. 2:14cv2655, 2016 WL 2733518, at *2 (S.D. Ohio May 10, 2016) (declining to consider Plaintiff's argument challenging the ALJ's credibility determination, because it was not raised before the Magistrate Judge in the statement of errors).

"In formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he deems credible." *Elliott v. Comm'r of Soc. Sec.*, No. 1:09cv2260, 2011 WL 400101 (N.D. Ohio, Jan. 11, 2011) (Armstrong, M.J.) (*citing Gant v. Comm'r of Soc. Sec.*, 372 Fed. App'x 582 (6th Cir. 2010); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994)), *adopted by* 2011 WL 441518 (Feb. 4, 2011). As the ALJ determined that

Plaintiff's representations concerning her symptoms were not credible, she did not err by not including any off-task limitations or other mental limitations based on discredited symptoms. The court, therefore, finds Plaintiff's third assignment of error is without merit.

## IV.   Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be AFFIRMED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: October 23, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.   *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**